1

2

3

4

5              **UNITED STATES DISTRICT COURT**

6                    **DISTRICT OF NEVADA**

7    DONALD ALT, *et al.*,

8          Plaintiffs,                                Case No. 3:21-CV-00353-RCJ-CLB

9    v.                                                            **ORDER**

10   UNITED STATES OF AMERICA, *et al.*,

11         Defendants.

12

13         Donald Alt (D. Alt) and Toby Alt (T. Alt), proceeding *pro se*, initiated this matter by filing

14   a 38-page "Petition for Writ of Prohibition."  (ECF No. 1.)  The caption of the pleading names, as

15   Defendants: the United States, Deb Haaland (Secretary of the Interior), Jon Raby (Nevada State

16   Director of the Bureau of Land Management (BLM)), and Shayla Freeman Simmons (Director of

17   the Interior Board of Land Appeals (IBLA) in the Office of Hearings and Appeals (OHA) in the

18   Department of the Interior (Department)) (collectively Defendants).[1]

19         Construed liberally, the Alts broadly ask that, pursuant to Nev. Rev. Stat. § 34.320 *et seq*,

20   this Court "issue a Writ of Prohibition directing Respondents to restrain from exercising any

21   authority not authorized by law, abuse of discretion and to restrain from causing Petitioner's [sic]

22   any further damage."  (ECF No. 1 at 34, ¶ 29.)  In the body of the pleading, the Alts further indicate

23   _____

24   [1]      The body of the petition also identifies, as respondents to the petition, the Department, the
     BLM, the IBLA, the OHA, and the Department's Cases Hearings Division (DCHD).

that they seek this relief because the OHA "is about to exercise a judicial or quasi-judicial function that is beyond its jurisdiction or in excess to authority granted." (*Id.* at 9, ¶ 4.)

The Defendants move to dismiss the pleading (ECF No. 9), which motion the Alts oppose (ECF No. 13). Having read and carefully considered the pleading and arguments of the parties, the Court will grant the motion and dismiss the complaint without prejudice.

## I. PROCEDURAL HISTORY

The Alts filed the present pleading on August 12, 2021. On October 25, 2021, the Defendants moved to dismiss. On November 9, 2021, the Alts filed an opposition. On November 16, 2021, the Defendants filed their reply.

The Alts filed a discovery plan on December 9, 2021.

On December 22, 2021, the Defendants moved to stay this matter pending resolution of the motion to dismiss and to strike the discovery plan. The Court granted both requests on January 11, 2022.

Presently before the Court is the Defendants' motion to dismiss.

## II. BACKGROUND

On January 16, 1962, Joseph Chavez received a "Notice of Allocation of Grazing Privileges and Allotment Boundary" (the 1962 Notice of Allocation) from the Department regarding a study made of the qualifications of Chavez's base property for grazing privileges in the Stockton Flats Allotment. As indicated in the notice,[2] it recited that a study had been made, in part, for the purpose of determining Chavez's "qualified Federal range demand in this Allotment." The notice further indicated that "[y]our Federal range demand will be permanently established and recorded regardless of any subsequent adjustments to grazing capacity." The Alts allege that Joseph Ricci purchased

---

[2]     The Alts have attached a copy of this document to their opposition.

the grazing preference from Chavez in October 1965.  D. Alt purchased the grazing preference from the estate of Ricci in 1999.

D. Alt owns water rights in the Stockton Flat Allotment that were assigned by the Nevada State Engineer.

In August 2018, the BLM's Sierra Front Field Office mailed a Notice of Field Manager's Proposed Decision to T. Alt.[3]  The Notice recited that D. Alt had leased 5 acres of land from T. Alt for a ten-year term running from November 1, 1998, to November 1, 2008.  In October 1998, D. Alt applied to the BLM to transfer the grazing preference for the Stockton Flat Allotment in the amount of 270 Animal Unit Months such that it would attach to the leased property as the requisite base property for the grazing preference.  The BLM approved the transfer and granted D. Alt a grazing permit for the Stockton Flat Allotment for a term running from November 1, 1999, to March 31, 2009.

The Alts allege that, in 2004, D. Alt moved his cattle to the private property of a fellow rancher "due to poor conditions on the Stockton Flat Allotment."  The fellow rancher leased the cattle from D. Alt and then released the cattle to graze on the Underwood Allotment.  After a year had passed, the BLM issued D. Alt a misdemeanor trespass citation for his cattle being on the Underwood Allotment.  The misdemeanor was tried before a federal magistrate judge, who found D. Alt guilty of trespass.  D. Alt paid the $10 administrative fee and the $300 fine imposed by the court.

---

[3]     The Defendants attached the Notice to their motion to dismiss.  Typically, this Court relies only on the pleadings of a complaint in considering a motion to dismiss.  However, given the allegations and relief requested by the Alts, the Court has been required to rely on certain undisputed factual recitations set forth in the Notice to provide the context that is necessary to meaningfully consider the Alts' complaint.

Following the trial, D. Alt continued to graze his cattle on the Stockton Flat Allotment under a grazing permit. During this time, D. Alt filed a "Notice of Possessory Right/Interest in the Stockton Flat Allotment" with the Lyon County Recorder's Office, the Nevada State Engineer's Office, and the BLM.

The Alts allege that the BLM refused to grant a continuation of D. Alt's grazing permit.[4] The BLM claimed that the written contract for the base property assigned to the Stockton Flat Allotment had expired.[5] The BLM knew that the Alts, who are father and son, had verbally continued the contract. The BLM claimed that the grazing preference had transferred to T. Alt.[6]

On August 8, 2018, the BLM sent T. Alt the previously noted Notice of Proposed Decision to cancel the grazing preference attached to base property owned by T. Alt. T. Alt did not timely protest the proposed decision but did timely appeal the final decision and petitioned to stay the final decision. The DCHD denied the petition to stay. The BLM and T. Alt filed cross-motions for summary judgment. D. Alt moved to dismiss the proceedings on the basis that he was an

---

[4]     This allegation appears to refer to actions taken by the BLM beginning in 2006 reflected in documents sent by the BLM to D. Alt. The BLM notified D. Alt of a Final Decision that (a) demanded payment of $33,934.02 related to the trespass on the Underwood Allotment, and (b) determined that D. Alts' future annual grazing authorizations would be suspended until this amount was paid or a payment schedule was approved.

In 2007, the BLM sent D. Alt a letter to remind him that his grazing authorization would end on February 28, 2007, and that a further grazing authorization could not be issued until payment was made or a schedule of payments approved.

[5]     This allegation appears to refer to the BLM's factual determination, reflected in the August 8, 2018, Notice of Proposed Decision – Cancellation of Grazing Preference Stockton Flat Allotment, that the lease agreement between D. Alt and T. Alt had expired on November 1, 2008.

[6]     This allegation appears to refer to the BLM's following factual determination in the August 8, 2018, Notice of Proposed Decision: "When the property lease expired, the grazing permittee (Donald D. Alt) lost control of the base property. The grazing permit terminated immediately without further notice from the BLM authorized officer in accordance with 43 CFR Part 4100 Section 4110.2-1(d). When a permit terminates due to the loss of control of the base property, the grazing preference remains with the base property."

indispensable party and the real party in interest but had not been joined.  The DCHD denied D. Alts' motion to dismiss and granted the BLM's motion for summary judgment.  T. Alt both appealed the DCHD's decision to the IBLA and petitioned the IBLA to stay the DCHD's decision.  The IBLA denied the petition to stay.  T. Alt filed a notice of intent to seek judicial review of the denial of the petition to stay.  D. Alt moved to intervene in the appeal, which motion the IBLA denied.  D. Alt filed a notice of intent to seek judicial review of the denial of the motion to intervene.

The Alts then filed the instant Petition for Writ of Prohibition in this Court.

The Alts allege, in their complaint, that the administrative court has cast aside and not addressed multiple relevant issues, including jurisdiction, chain of title, takings, prior adjudications, proper party in interest, indispensable parties, and congressional intent.

## III. LEGAL STANDARDS

"[T]he procedure in all civil actions and proceedings in the United States district courts" is governed by the Federal Rules of Civil Procedure.  Fed. R. Civ. Pro. 1.  Those Rules provide that "[t]here is one form of action—the civil action," which "is commenced by filing a complaint with the court."  Fed. R. Civ. Pro. 2, 3.  The pleading initiating the civil action is a complaint.  Fed. R. Civ. Pro. 7(a)(1).  Pursuant to Rule 8, a pleading that states a claim for relief "must contain (1) a short and plain statement of the grounds for the court's jurisdiction . . . , (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought."  "Each allegation must be simple, concise, and direct."  Fed. R. Civ. Pro. 8(d)(1).

To establish Article III standing, a plaintiff must show (1) injury-in-fact: that is, an injury which is "concrete and particularized" and either "actual or imminent;" (2) a "causal connection" between the alleged injury and the conduct complained of; and (3) a likelihood, as opposed to mere speculation, that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted); *see also Wash. Envtl. Council v. Bellon,*

732 F.3d at 1139-40.  "To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560.

The United States is immune from suit unless it consents to be sued.  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  In the absence of an express sovereign immunity waiver, a plaintiff "must look beyond [its] jurisdictional statute[s] for a waiver of sovereign immunity with respect to [its] claim."  *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Under the APA, the United States waives its sovereign immunity when a person has suffered some legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.  *See* 5 U.S.C. § 702; *Alaska v. Babbitt*, 38 F.3d 1068, 1072 (9th Cir. 1994).  "[A]gency action," in turn, is defined to include "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see also Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004) (recognizing that the categories of agency action identified in 5 U.S.C. § 551(13) are "circumscribed" and "discrete").  Finally, where no other statute provides a private right of action "the 'agency action' complained of must be 'final agency action.'"  *SUWA*, 542 U.S. at 61-62 (emphasis in original); see also 5 U.S.C. § 704.  Final agency actions are actions which (1) "mark the 'consummation' of the agency's decisionmaking process" and 2) "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow'."  *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (citations omitted).

A motion to dismiss, brought pursuant to Fed. R. Civ. P. 12(b)(6), challenges whether the complaint states "a claim upon which relief can be granted."  In ruling upon this motion, the Court is governed by the relaxed requirement of Rule 8(a)(2) that the complaint need contain only "a short

1    and plain statement of the claim showing that the pleader is entitled to relief."  As summarized by

2    the Supreme Court, a plaintiff must allege sufficient factual matter, accepted as true, "to state a claim

3    to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007),

4    *Landers v. Quality Communications, Inc.*, 771 F.3d 638, 641 (9th Cir. 2015).  Nevertheless, while a

5    complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds'

6    of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation

7    of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555, *Landers*, 771 F.3d at

8    642.  In deciding whether the factual allegations state a claim, the court accepts those allegations as

9    true, as "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a

10   complaint's factual allegations."  *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  Further, the court

11   "construe[s] the pleadings in the light most favorable to the nonmoving party."  *Outdoor Media

12   Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).

13       However, bare, conclusory allegations, including legal allegations couched as factual, are not

14   entitled to be assumed to be true.  *Twombly*, 550 U.S. at 555, *Landers*, 771 F.3d at 641.  "[T]he tenet

15   that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

16   conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "While legal conclusions can provide

17   the framework of a complaint, they must be supported by factual allegations."  *Id.* at 679.  Thus, this

18   court considers the conclusory statements in a complaint pursuant to their factual context.

19       To be plausible on its face, a claim must be more than merely possible or conceivable.

20   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

21   misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'"

22   *Id.* (citing Fed. R. Civ. P. 8(a)(2)).  Rather, the factual allegations must push the claim "across the

23   line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Thus, allegations that are consistent

24

with a claim, but that are more likely explained by lawful behavior, do not plausibly establish a claim. *Id.* at 567.

## IV. DISCUSSION

The Alts' complaint initiating this civil action, which they caption as a petition for writ of prohibition, does not provide a short and plain statement regarding either this Court's jurisdiction or any claim for relief. Rather, described generously (and as succinctly as possible), most of the pleading appears devoted to an argument that the Taylor Grazing Act (Taylor Act), 43 U.S.C. § 315 *et seq.*, is ambiguous; that the Alts have—pursuant to the TGA (when properly understood), the 1962 Notice of Allocation, and other precedent—various property or possessory interests in the grazing preference, and that the Defendants' administrative courts are not protecting those interests. As such, the Alts ask that this Court enjoin the Defendants' rendering any further decision regarding the grazing preference.

As set forth below, the Court finds that it has jurisdiction of the Alts' complaint, that each of the Alts have standing to bring a claim regarding the grazing preference, but that the Alts have not stated a cognizable claim for relief.

### A. Jurisdiction

As an initial matter, the Court must first determine whether it has jurisdiction of the Alts' complaint. The Alts' reliance, in their complaint and opposition, on Nev. Rev. Stat. §§ 34.320 and 34.340 as providing jurisdiction is misplaced. These Nevada statutes constitute the State of Nevada's authorization for its state courts to provide a specific remedy in the form of a writ of prohibition. They neither grant jurisdiction to this Court nor authorize this Court to grant the remedy established in the statutes.

To show jurisdiction, the Alts also rely, in both their pleading and their opposition, on the All Writs Act, 28 U.S.C. § 1651, which provides that "[t]he Supreme Court and all courts established

1   by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions

2   and agreeable to the usages and principles of law."  The All Writs Act does not, however, provide

3   federal courts with an independent grant of jurisdiction.  *Clinton v. Goldsmith*, 526 U.S. 529, 534–

4   35 (1999) ("[T]he express terms of the Act confine the power of [a federal court] to issuing process

5   'in aid of' its existing statutory jurisdiction; the Act does not enlarge that jurisdiction").

6          The Alts' pleading references the Administrative Procedures Act (APA), and they argue, in

7   their opposition, that jurisdiction is appropriate under the APA.  They are incorrect.  The APA does

8   not create "subject-matter jurisdiction permitting federal judicial review of agency action." *Califano*

9   *v. Sanders*, 430 U.S. 99, 107 (1977).

10         Nevertheless, though fairly buried within their pleadings, the Alts also reference 28 U.S.C.

11  § 1331, which grants federal courts original jurisdiction over matters "arising under the Constitution,

12  laws, or treaties of the United States."  28 U.S.C. §1331.  Accordingly, liberally construed, the Alts

13  have brought this complaint pursuant to this Court's federal question jurisdiction under § 1331.

14  **B.  Standing**

15         The Defendants argue that the Alts lack standing, asserting that T. Alt has conceded he lacks

16  any ownership in the underlying grazing preference and that, contrary to D. Alt's assertions, D. Alt

17  no longer has any legally cognizable interest in the grazing preference.  In considering whether the

18  Alts have a cognizable legal interest in the grazing preference, and to provide some context, the

19  Court begins by noting the following summary of the Taylor Act as recited by the Supreme Court in

20  *Public Lands Council v. Babbitt,* 529 U.S. 728, 733–36:

21              The Taylor Act seeks to "promote the highest use of the public lands." 43
            U.S.C. § 315.  Its specific goals are to "stop injury" to the lands from "overgrazing
22          and soil deterioration," to "provide for their use, improvement and development,"
            and "to stabilize the livestock industry dependent on the public range." 48 Stat.
23          1269.  The Act grants the Secretary of the Interior authority to divide the public
            range-lands into grazing districts, to specify the amount of grazing permitted in
24          each district, to issue leases or permits "to graze livestock," and to charge
            "reasonable fees" for use of the land. 43 U.S.C. §§ 315, 315a, 315b.  It specifies

9

that preference in respect to grazing permits "shall be given ... to those within or near" a grazing district "who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights." § 315b.  And, as particularly relevant here, it adds:

> "So far as consistent with the purposes and provisions of this subchapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit ... shall not create any right, title, interest, or estate in or to the lands." *Ibid.*

. . .

By 1937 the Department had set the basic rules for allocation of grazing privileges.  Those rules recognized that many ranchers had long maintained herds on their own private lands during part of the year, while allowing their herds to graze farther afield on public land at other times.  The rules consequently gave a first preference to owners of stock who also owned "base property," i.e., private land (or water rights) sufficient to support their herds, and who had grazed the public range during the five years just prior to the Taylor Act's enactment.  *See* 2 App. 818–819 (Rules for Administration of Grazing Districts (June 14, 1937)). They gave a second preference to other owners of nearby "base" property lacking prior use.  *Ibid.*  And they gave a third preference to stock owners without base property, like the nomadic sheep herder.  *Ibid.*  Since lower preference categories divided capacity left over after satisfaction of all higher preference claims, this system, in effect, awarded grazing privileges to owners of land or water.

. . .

As grazing allocations were determined, the Department would issue a permit measuring grazing privileges in terms of "animal unit months" (AUMs), i.e., the right to obtain the forage needed to sustain one cow (or five sheep) for one month.  Permits were valid for up to 10 years and usually renewed, as suggested by the Act. *See* 43 U.S.C. § 315b; Public Land Law Review Commission, One Third of the Nation's Land 109 (1970).  But the conditions placed on permits reflected the leasehold nature of grazing privileges, consistent with the fact that Congress had made the Secretary the landlord of the public range and basically made the grant of grazing privileges discretionary.  The grazing regulations in effect from 1938 to the present day made clear that the Department retained the power to modify, fail to renew, or cancel a permit or lease for various reasons.

The Supreme Court further noted that "in 1976, Congress enacted a new law, the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2744, 43 U.S.C. § 1701 *et seq*., which instructed the Interior Department to develop districtwide land use plans based upon concepts of

1   'multiple use' (use for various purposes, such as recreation, range, timber, minerals, watershed,

2   wildlife and fish, and natural and scenic, scientific, and historical usage), § 1702(c), and 'sustained

3   yield' (regular renewable resource output maintained in perpetuity), § 1702(h). The FLPMA

4   strengthened the Department's existing authority to remove or add land from grazing use, allowing

5   such modification pursuant to a land use plan, §§ 1712, 1714, while specifying that existing grazing

6   permit holders would retain a 'first priority' for renewal so long as the land use plan continued to

7   make land 'available for domestic livestock grazing,' § 1752(c)." 529 U.S. at 737–38.

8        The Supreme Court subsequently held, in *Public Lands Council,* that the Department's 1995

9   regulations regarding grazing preferences were consistent with these laws.  In doing so, the Supreme

10  Court noted that

11         [b]efore 1995 the regulations defined the term "grazing preference" in terms of
           the AUM-denominated amount of grazing privileges that a permit granted. The
12         regulations then defined "grazing preference" as

13             "the total number of animal unit months of livestock grazing on public
               lands apportioned and attached to base property owned or controlled
14             by a permittee or lessee." 43 CFR § 4100.0–5 (1994).

15         The 1995 regulations changed this definition, however, so that it now no longer
           refers to grazing privileges "apportioned," nor does it speak in terms of AUMs.
16         The new definition defines "grazing preference" as

17             "a superior or priority position against others for the purpose of
               receiving a grazing permit or lease.  This priority is attached to base
18             property owned or controlled by the permittee or lessee." 43 CFR
               § 4100.0–5 (1995).

19

20  529 U.S. at 740.

21        The Defendants argue that T. Alt lacks standing because he cannot show an actual, concrete

22  injury-in-fact.  The Court disagrees.  The BLM initiated the underlying administrative proceeding

23  when it sent its August 8, 2018, Notice of Field Manager's Proposed Decision – Cancellation of

24

Grazing Preference Stockton Flat Allotment to T. Alt.[7]  A cursory review of that document indicates that the BLM was notifying T. Alt that it was proposing to cancel a grazing preference attached to certain real property.  The Notice further indicates that the BLM sent this notice to T. Alt for two reasons.  First, the BLM determined that T. Alt was the owner of the base property to which the grazing preference was attached.  Second, the BLM had determined that, when the property lease between T. Alt and D. Alt expired, D. Alt lost control of the property, the grazing permit terminated without further notice from the BLM authorized officer, and the grazing preference remained with the base property.  That the BLM sent this notice to T. Alt certainly permits a plausible inference, at a minimum, that T. Alt has a legally cognizable interest in the grazing preference attached to his property.  Further, given that the expressly stated purpose of the BLM's action was to cancel that grazing preference, the record supports a finding that the complaint concerns a particularized, concrete and immediate injury to T. Alt's interest in the grazing preference.

The Defendants appear to argue that T. Alt cannot show an injury because he initiated the administrative appeal process challenging the BLM's decision to cancel the grazing preference, rendering any harm for those proceedings to be "self-inflicted."  The argument proves too much, resulting in the absurd proposition that a person must exhaust his administrative remedies to bring a claim for judicial review but, by doing so, loses standing to bring a claim for judicial review.  The Defendants' argument, if adopted, would effectively preclude any person from bringing an APA claim for judicial review of a BLM final agency action.  The Court finds that T. Alt did not lose standing by appealing the BLM's final decision to cancel the grazing preference.

The Defendants argue that T. Alt concedes he lacks a cognizable interest in the grazing preference when he alleges, in the complaint, that he has "no ownership in the preference."  The

---

[7] The Defendants have attached this document to their motion to dismiss.

1    statement does not defeat a finding that T. Alt has a legally cognizable interest in the grazing

2    preference for purposes of determining standing to proceed with this litigation.  Liberally construed,

3    the statement suggests that D. Alt and T. Alt are pursuing claims in the alternative given the context

4    of the Plaintiffs' complaint and the administrative proceedings.  In particular, while D. Alt asserts

5    that the grazing preference is his, the Alts have alleged that the BLM stripped the preference from

6    him.  This allegation is consistent with Notice of Proposed Decision, upon which the Defendants

7    rely, which indicates that the BLM has treated the grazing preference as having been transferred to

8    T. Alt.  As such, the Court readily construes the complaint as alleging, in the alternative, that the

9    relevant interest in the grazing preference lies either with D. Alt (accepting D. Alt's contention that

10   the BLM improperly attempted to strip him of that interest) or with T. Alt (accepting the BLM's

11   contention that the grazing preference transferred from D. Alt to T. Alt on the expiration of the

12   lease).  Such pleadings in the alternative, even if inconsistent, are permissible and appropriate.  *See*

13   Fed. R. Civ. Pro. 8(d)(2 & 3).

14          The Defendants argue that T. Alt cannot assert an interest in the grazing preference because

15   he failed to formally transfer the preference to himself when D. Alt's lease of T. Alt's property

16   expired.  This argument fails because, as it concerns T. Alt, the present complaint must be construed

17   as challenging the BLM's determination that T. Alt no longer has an interest in the preference

18   because he failed to formally transfer the preference to himself.  In considering the question whether

19   T. Alt has standing, BLM's own conduct of notifying T. Alt that it was cancelling the preference

20   attached to the base property, because T. Alt owned the base property, sufficiently shows that T. Alt

21   has an interest in the preference sufficient to support standing.  Accordingly, the Court finds that T.

22   Alt has standing.

23          D. Alt also has standing.  At a minimum, the Alts have alleged that D. Alt previously had an

24   interest in the grazing preference.  The Defendants have acknowledged as much, given that the

13

BLM's August 18, 2018, Notice of Proposed Decision recited that the grazing preference for the Stockton Flat Allotment was attached to T. Alt's land on November 11, 1999 "in response to a grazing application from Donald D. Alt, who offered the land as base property.  The property was controlled by Donald D. Alt through a property lease agreement."  The BLM then noted its determination that D. Alt's interest in the grazing preference terminated upon the expiration of the ten-year lease agreement between D. Alt and T. Alt.  Liberally construed, the Alts allege that the BLM improperly stripped D. Alt of the preference.

The Defendants argue that D. Alt does not have an interest in the grazing preference because he does not have control of the base property.  The argument fails because the Alts have alleged that, after the expiration of the written lease, D. Alt continued to have control of the base property through a verbal lease with T. Alt.  The Defendants have not directed the Court's attention to any authority establishing, as a matter of law, that control of the base property by means of a verbal lease agreement is insufficient to maintain an interest in the grazing preference.  Accordingly, in considering the Defendants' motion to dismiss, the Court finds that D. Alt also has standing.

### C. Claim for Relief

While Plaintiffs have standing to bring a claim arising from an injury to their respective alleged interests in the grazing preference, they have not alleged a cognizable claim for relief.  The Court has an obligation to accept pleadings as true for purposes of deciding a motion to dismiss. The Court must also construe the pleadings in favor of a non-moving party.  These obligations, however, do not permit the Court to assume that a plaintiff has made a claim that lacks any foundation in, or is inconsistent with, the pleadings.

The Alts have brought this complaint against the United States and three of its officers.  Even the most liberal construction of the complaint requires finding that the Alts have named the officers in their official capacity.  The Alts' complaint does not concern the actions of the specific officers,

14

but instead rests upon the alleged conduct of the Department and particularly the BLM and the OHA. As such, to maintain any claim in this action, the Alts must establish they are bringing a claim for which the United States has waived its sovereign immunity.  They have not done so.

The United States has waived its sovereign immunity in the APA, which appears to be most relevant avenue by which the Alts could potentially bring a complaint against the Defendants.  The Alts alleged that they have "actively engaged in administrative process(es) associated to this case." They assert that the Defendants have used "administrative practices" that "can be characterized as a manifest injustice against both Petitioner's [sic] ALT."  They continue, "[t]he record of the administrative court, [sic] clearly shows that multiple relevant issues involved in this case are and have been cast aside and not addressed in a proper manner; i.e. jurisdiction, chain of title, constitutional protections against 'takings', documented and controlling prior adjudications, proper party in interest, congressional intent and indispensable parties, to name just a few."  The Alts conclude that the "administrative court merely brushed the Petitioners [sic] arguments aside and did not even reasonably attempt to address such issues even though all are relevant to the case."  In short, the Alts' complaint permits the inference that they are challenging various agency actions, which actions can be challenged in an APA claim seeking judicial review of a final agency action.

However, the Alts' decision to solely seek relief in the form of prohibiting the Defendants' from rendering a decision (in T. Alts' pending appeal before the IBLA) requires the conclusion that they have *not* brought a claim challenging a final agency action pursuant to the APA.  As relevant to the actions of the BLM and the OHA, the APA provides a mechanism by which a party can seek judicial review of a final agency action.  While the Alts appear to allege that each step in the administrative proceedings has been riddled with error, their complaint does not actually seek review of any decision that could be considered a "final agency action."  To the contrary, the Alts' complaint broadly asks this Court to "direct[] Respondents to restrain from exercising any authority not

authorized by law, abuse of discretion and to restrain from causing Petitioner's [sic] any further damage." In opposing the motion to dismiss, the Alts acknowledge that, ultimately, they are asking this Court to prohibit the Department's Office of Hearings and Appeals "from rendering a decision." A generous construction of the Alts' request is that their complaint is a premature APA claim for judicial review. This construction is supported by the Alts' assertion, in their complaint, that the Defendants' actions "must be scrutinized and addressed by the federal court with the first step being the issuance" of an injunction prohibiting the IBLA from entering its decision. However, as judicial review under the APA is of a final agency action, not an anticipated agency action, to the extent that the Alts' complaint alleges an APA claim, the Court must dismiss such claim as premature.

However, the Alts' request for relief can also be read, consistent with the complaint, as an intentional effort to preclude the Court from construing their complaint as brought pursuant to the APA. The Alts expressly assert, in their complaint, that they seek to prohibit the IBLA's ruling because it "would constitute a manifest injustice against the Alts' specifically and will set a dangerous precedent to be utilized against other Americans in the future." This statement, taken at face value, suggests that the Alts only want this Court to enter an order adopting their argument that the Defendants lack jurisdiction to engage in any administrative proceedings regarding either their specific grazing preference or the grazing preference of any other person. This construction of the complaint is further indicated by the Alts' apparent reliance on Nevada's writ of prohibition, given their argument that the Defendants lack jurisdiction to render a final decision. The Alts cannot, however, maintain a claim against the Defendants pursuant to Nevada's statute authorizing Nevada's state courts to enter writs of prohibition. Thus, to the extent the Alts allege a claim for relief pursuant to Nev. Rev. Stat. § 34.320 *et seq.*, the Court must dismiss such claim with prejudice.

Regardless of whether the Alts' complaint is a premature APA claim or is a defective request to enjoin the Defendants from further action pursuant to Nevada law, the complaint must be dismissed at it fails to state a cognizable claim for relief.

In dismissing the Alts' complaint, the Court readily concludes that the Alts cannot amend their complaint to state a cognizable claim pursuant to Nev. Rev. Stat. §§ 34.320 *et seq.*  As such, to the extent that the Alts' complaint seeks relief pursuant to Nev. Rev. Stat. §§ 34.320 *et seq.*, the Court must dismiss any such claim with prejudice.

However, the Court cannot find that the Alts would be unable to amend their complaint to state a cognizable APA claim that seeks judicial review of a final agency action that has been taken by the Defendants' relative to the disputed grazing preference.  Accordingly, to the extent the Alts' complaint is asserting an APA claim that is deficient as it fails to seek judicial review of a final agency action, the Court will dismiss the complaint without prejudice but with leave to file an amended complaint alleging a cognizable claim for judicial review under the APA.  Further, to promote judicial economy, the Court will grant the Alts leave to file an amended complaint not later than 30 days from the entry of this order.

If the Alts choose to file an amended complaint, they are advised that an amended complaint entirely replaces the original complaint and, thus, the amended complaint must be complete.  *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) (holding that "[t]he fact that a party was named in the original complaint is irrelevant; an amended pleading supersedes the original"); *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (holding that for claims dismissed with prejudice, a plaintiff is not required to reallege such claims in a subsequent amended complaint to preserve them for appeal).  To be complete, an amended complaint must contain all claims, defendants, and factual allegations that a plaintiff wishes to pursue in the lawsuit.

1       If the Alts fail to timely file an amended complaint, the Court will close this matter without

2 prejudice as to any action brought pursuant to the APA.

3 **CONCLUSION**

4       IT IS HEREBY ORDERED that the Defendants' Motion to Dismiss (ECF No. 9) is

5 GRANTED as follows.  To the extent Plaintiffs seek relief pursuant to Nev. Rev. Stat. § 34.320 *et*

6 *seq.*, such claim is DISMISSED with prejudice.  Plaintiffs' complaint is otherwise DISMISSED

7 without prejudice to the extent it asserts a claim for judicial review of a final agency action pursuant

8 to the Administrative Procedures Act.

9       IT IS FURTHER ORDERED that Plaintiffs may, if they so choose, amend their complaint

10 not later than 30 days after entry of this Order.  The Court will close this matter if Plaintiffs' fail to

11 timely file an amended complaint.

12       IT IS SO ORDERED.

13

14 Dated: <u>May 12, 2022</u>

15

16 _____

17                ROBERT C. JONES
              United States District Judge

18

19

20

21

22

23

24

18